## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**PHILIP BENHAM**,

     Plaintiff,

vs.

CIVIL ACTION NO: _3:19cv911HTW_-LRA

**CITY OF JACKSON, MISSISSIPPI, and JAMES E. DAVIS, in his official capacity as Chief of Police for Jackson Police Department**

**VERIFIED COMPLAINT**

     Defendants.

Comes now Plaintiff Philip Benham and avers the following:

## INTRODUCTION

1.     This is a civil rights action brought by Philip Benham ("Benham") against City of Jackson, Mississippi ("Jackson") and James E. Davis, in his official capacity as Chief of Police for Jackson Police Department ("Chief Davis"), challenging the constitutionality of Jackson Code of Ordinance § 86-401, *et seq.* "Prohibiting Certain Activities Near Health Care Facilities."  Section 86-403 of the ordinance creates a floating personal "bubble zone" that prohibits an individual from approaching another person for purpose of communicating within eight (8) feet of such person in public area or sidewalk inside a radius of one hundred (100) feet of any entrance of a health care facility, including abortion clinic, without first obtaining that person's consent.  Section 86-404 establishes a "buffer zone" that prohibits an individual from engaging in speech in zone extending fifteen (15) feet from any entrance to a health care facility, including an abortion clinic.  And § 86-405 mandates a "quiet zone" that prohibits amplified speech or unamplified speech with a raised voice within one hundred (100) feet of the property line of a health care facility, including

an abortion facility, if such facility identifies itself as a quiet zone and places appropriate signage declaring this status.

2.      Section 86-401 *et. seq.* eliminates or severely restricts every communicative method of Benham as well as others not before the Court who want to share a peaceful pro-life message to those visiting an abortion facility in Jackson.

3.      The ordinance also eliminates various means of speech within 100 feet of other health care facilities in Jackson.

4.      Pursuant to 42 U.S.C. §§ 1983 and 1988, Benham seeks injunctive relief, declaratory relief, and nominal damages against Defendant Jackson.

5.      This action concerns Benham's fundamental right to free speech and due process as recognized in the First and Fourteenth Amendments to the United States Constitution.

6.      This Ordinance has deprived and persists in depriving Benham of his constitutional freedoms.

7.      Each and every act alleged herein was committed under the color of state law and authority.

## JURISDICTION AND VENUE

8.      This action raises federal questions, specifically, under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

9.      Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has jurisdiction over Benham's claims for injunctive relief and nominal damages.  Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction over Benham's request for declaratory relief.  Pursuant to 42 U.S.C. § 1988, this Court has jurisdiction over Benham's claims for costs and attorney fees.

10.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of Mississippi, because all claims arise out of this district and defendants reside in this district.

## PLAINTIFF

11.      Plaintiff Benham resides in Concord, North Carolina.

## DEFENDANTS

12.      Defendant Jackson is a municipal governmental authority in the State of Mississippi and has the authority to enact regulations pertaining to the use of city streets and sidewalks.

13.      Defendant Chief Davis is the Chief of Police for the Jackson Police Department. In his official capacity, Chief Davis is responsible for overseeing and implementing all policies affecting law enforcement, including enforcement of ordinances on public streets and sidewalks in the city.  Chief Davis is sued in his official capacity.

## STATEMENT OF FACTS

**Benham's Religiously-Oriented Pro-Life Expression**

14.      Benham is an evangelical Christian and travelling missionary for the Christian faith.  He wants to share the gospel of Jesus Christ and other biblically-based truths with all people.

15.      Benham feels particularly called to share his beliefs about unborn babies who are at risk of being aborted.

16.      Benham believes God creates human life in His image, beginning at fertilization in the mother's womb, and that all life deserves to live.  He is convinced that the abortion procedure wrongfully ends precious human life

17.     Benham has been involved pro-life ministry for several decades, having served as director of Operation Save American, a preborn Christian ministry, from 1994 to 2014.

18.     His Christian faith and love for others has moved Benham, and continues to move him, to go all over the country and share his beliefs about preborn life with people contemplating or are otherwise affected by abortion.

19.     Benham seeks to reach as many people as possible with his pro-life message, especially women and their families and friends who visit abortion clinics.  He wants to share the love of Jesus Christ with these individuals, encourage them to see their babies as a blessing, explain the harm that abortion causes to women, and implore them to choose life over death.

20.     Benham also, when given opportunity, provides women considering an abortion with practical help, supplying information about local doctors, sonograms, churches, baby supplies, places to live, and other things, that can help women keep their babies.

21.      To communicate his life-affirming message, Benham goes to public sidewalks, streets, and ways bordering abortion clinic property because these venues are the only places where Benham knows he will reach his target audience.

22.     Benham conveys his religious, pro-life messaging in front of abortion clinics in various ways.

23.     He brings signs with him that display succinct statements and images about abortion.

24.     Benham also hands out pamphlets explaining the gospel of Jesus Christ and facts about abortion.

25.     Benham also likes to wear expressive clothing bearing pro-life messaging.

4

26.     Ideally, Benham has a chance to engage in friendly discussions with people who are visiting an abortion clinic while standing a few feet, a comfortable, conversational distance, away from them.

27.     Benham also typically carries an amplification device when he stands outside an abortion clinic, so he can speak with people at a conversational level.  If he doesn't have an amplification device, he will raise voice if needed for someone to hear his message.

28.     When travelling to an abortion clinic, Benham often seeks out and joins local Christians who share his same beliefs about abortion and speaks with them outside the abortion clinic.

29.     Benham believes all human life deserves protection.  He therefore does not condone violence or harm of any kind, including acts of violence against abortion clinics or staff.

30.     Benham is respectful with his pro-life speech.  He knows he needs to be winsome to persuade people of the rightness of his position.

31.     In addition to other places, Benham wants to share his message about abortion and abortion alternatives on public sidewalks, streets, and ways abounding Jackson Women's Health Organization abortion clinic in Jackson, Mississippi.   He has visited abortion clinic in Jackson many times over the years, ever since 1996 or 1997, and wants to go back to minister in front of the State's only abortion clinic again.

**Benham's Expression Outside Jackson Women's Health Organization Abortion Clinic**

32.     In working out his travel schedule for 2020, Benham plans to come to Jackson, Mississippi.  While in Jackson, he intends to go by the Jackson Women's Health Organization

("JWHO") abortion clinic to communicate his abortion beliefs on the bordering sidewalk.  He never visits Jackson without going by the abortion clinic.

33.     JWHO is an abortion clinic located in a bright pink building on 2903 N. State Street in Jackson, Mississippi.

34.     JWHO abortion clinic and grounds are situated on the northwest corner of N. State Street and Fondren Place in the Fondren district of Jackson, just a few miles north of downtown.

35.     The parking lot for JWHO is just west of the abortion clinic, containing an entrance off of Fondren Place.  The Fondren Place side of the building has two other entrances besides the parking lot entrance.

36.     Individuals who want to go to JWHO enter the abortion clinic primarily by parking in the adjoining parking lot and walking in the back door of the clinic.  Some visitors park on either side of Fondren Place in close proximity to the abortion clinic and walk to and through one of the two Fondren Place walking entries on that side of the building.

37.     When Benham goes to JWHO to engage in his expressive activity, he likes to stand on the public sidewalk on either side of the parking lot entrance off of Fondren Place, usually, on the west side of the entrance, and hold up a sign conveying a pro-life message as he looks and waits for individuals who drive onto Fondren Place from N. State Street and pull into the JWHO driveway of the parking lot.

38.     Benham holds up a sign outside of JWHO abortion clinic so he can instantly communicate a pro-life message to those attending the clinic.  He considers signage a particularly critical method of communication outside the abortion clinic because a sign is often the only pro-life message a person going to the clinic will receive.

39.     Signs also help Benham grab the attention of those driving into the parking lot. After getting their attention, he encourages drivers to stop their car and roll down the window so he can hand them written information about the gospel and abortion.

40.     When he stands on the sidewalk by the parking lot of JWHO, Benham is frequently joined by a local friend or someone else in the pro-life community, where they work together, holding signs and/or wearing expressive clothing and hand out pamphlets.

41.     If the drivers of vehicles stop at the entry of the parking lot, Benham offers written literature and tries to have a brief, friendly conversation with them about his beliefs.  Benham finds these forms of communication are very effective, frequently leading to more in-depth conversations and sometimes a change in opinion about abortion.

42.     Should the drivers of the vehicles proceed into parking lot without stopping, Benham will continue to share his life-affirming message from the time they exit the car until they walk in the door of the abortion clinic.  Sometimes, Benham will call out to these women with a raised voice, so his message can be heard.  If he has access to an amplification device, Benham will often use it to convey his message to individuals as they walk in the parking lot, which device allows him to speak and be heard at a conversational level.

43.     Most of the people visiting JWHO abortion clinic enter by parking in the clinic's parking lot and walking into the building, but others park on either side of Fondren Place and walk to the abortion clinic in one of the other entryways.

44.     Should Benham notice someone park on Fondren Place and walk toward the clinic, he will take approach that person to give literature and try to engage that person in conversation about abortion.

**Section 86-401, *et. seq.* Prohibiting Certain Activities Near Health Care Facilities**

45.　　　Some members of the business community in the Fondren district in Jackson, including JWHO, asked the Jackson City Council to restrict expressive activity taking place near the JWHO abortion clinic.

46.　　　In response to this request, the Jackson City Attorney's office drafted ordinance § 86-401, *et seq.*, prohibiting certain activities near health care facilities.  City Attorney Tim Howard and Mayor Chokwe Antar Lunumba presented the ordinance to the City Council for consideration during regular meeting of September 17, 2019.

47.　　　President of the Jackson City Council, Virgi Lindsay, noted the ordinance on the agenda, but reciting a need for significant time to deliberate and hear public comments, voiced an intention to hold off on discussion until they could consider the matter during a special meeting of the City Council.  Howard indicated that information they put in the record is important due to "constitutional pitfalls" with the ordinance and he could walk them through the ordinance.

48.　　　Nine days later, on September 26, 2019, the City Council held a special meeting and brought up § 86-401, *et seq.* for consideration on the agenda for that day.  A motion was made to approve the ordinance, which was seconded, allowing for discussion in support of and against the ordinance.

49.　　　President Lindsay called on City Attorney Howard to speak to the ordinance.  As a preface, Howard reiterated his concerns about "constitutional pitfalls" as reason for providing the City Council a detailed basis supporting passage of the ordinance.

50.　　　Howard conceded the proposed ordinance restricts protected speech but opined that the restrictions are still constitutional.  He said the ordinance must be considered narrowly tailored

to a significant government interest to survive constitutional scrutiny, which he described in layman terms as: "Don't do too much… or don't restrict speech too much."

51.      Expounding on this notion, Howard turned his attention to certain aspects of the ordinance, specifying the 8-fooot bubble zone set out in § 86-403 and the 15-foot buffer zone described in § 86-404.

52.      Referencing § 86-403, Howard explained that this section would prevent any person from knowingly approaching within 8 feet of another person, unless such person consents, for the purpose of engaging in expression on a public way or sidewalk within a 100-foot radius of any entrance to health care facility property.  He explained the buffer zone of § 86-404 as not allowing any person to knowingly congregate, patrol, picket, or demonstrate in a zone extending 15 feet from any entrance to a health care facility.

53.      In support of the § 86-403 8-foot bubble zone, Howard relied on a similar ordinance upheld as constitutional in *Hill v. Colorado*, 538 U.S. 703 (2000).  Howard did not indicate whether JWHO or any other health care facility in Jackson had encountered same or similar concerns supporting the legislation discussed in *Hill*.

54.      Moving on to the § 86-404 15-foot buffer zone, Howard said the ordinance "mirrors" one in Pittsburg, Pennsylvania that was challenged and upheld in *Bruni v. City of Pittsburg*, 283 F.Supp.3d 357 (W.D. Pa. 2017).  Howard did not indicate the history of facilities in Jackson mirrors the history of facilities that supported the ordinance in *Bruni*.

55.      Howard listed several government interests that were upheld as appropriate in these two cases as significant, namely: 1) ensuring unimpeded access to health care facilities and avoidance of potential trauma to patients associated with up-close, confrontational protests, 2)

supporting an individual's right to be let alone and to privacy and tranquility, 3) supporting an individual's interest in avoiding unwanted communication when they are powerless to avoid it, 4) protecting those who wish to enter a health care facility, many of whom are already under mental and physical distress because of why they're going there, and 5) provide more of a bright-line type of guidance to law enforcement so that the ordinance can be enforced even handedly.  He did not comment on how any of these interests relate to any concerns outside of JWHO or any other health care facility in Jackson.

56.     Continuing, Howard claimed the restrictions are narrowly tailored, again borrowing verbiage from the cases he cited without explaining how the reasoning of those cases apply to JWHO or other health care facilities in Jackson.

57.     Howard also discussed the import of a third section, § 86-405, which bans shouting and any amplified sound within 100 feet of the property line of a health care facility.  In support of this section, Howard relied on a similar ordinance upheld in *Pine v. West Palm Beach*, 762 F.3d 1262 (11th Cir. 2014).  He did not say whether the Jackson ordinance shared a similar history to the West Palm Beach ordinance in *Pine*.

58.     For evidential support of §86-401, *et seq*., Howard called on Commander Keith Freeman, a police officer with the Jackson Police Department who oversees the precinct where JWHO is located, to come to the podium and speak to the City Council.

59.     Commander Freeman informed the Jackson City Council that the police department had received over 300 calls for service regarding activity taking place outside of the JWHO abortion clinic in the last ten years.  He did not elaborate on the nature of the calls or whether any

of the complaints were merited.  The commander bemoaned the police efforts needed to "keep the peace" around the abortion clinic.

60.  Commander Freeman assured that their policing efforts have been effective but added that the time officers spent in addressing complaints emanating from the abortion clinic kept them from doing other things, and he hoped the ordinance would resolve these issues.

61.  After Commander Freeman concluded his remarks, President Lindsay called on members of the public to comment on the ordinance, five (5) in opposition to the ordinance and five (5) in support of the ordinance.

62.  The 5 individuals speaking in opposition to the ordinance complained of the various ways the proposed ordinance impedes on protected speech outside the JWHO abortion clinic.

63.  Shannon Brewer, the JWHO abortion clinic director, spoke in favor of the ordinance.  Also, three business leaders and a resident from the Fondren district spoke in favor of the ordinance.  All of them complained about expressive activity outside of JWHO having an adverse impact on local businesses.

64.  One member of the City Council asked why so much focus was put on the JWHO abortion clinic when the ordinance coves all health care facilities in Jackson.  Howard explained the ordinance addresses all health care facilities in addition to JWHO because they were constitutionally required to treat all health care facilities the same.

65.  Another member of the City Council asked Howard to explain how existing ordinances apply to the situation at hand.  Howard replied that any such ordinances came under a consent decree to which Jackson was bound, and though he believed the consent decree had recently lifted, he did not believe it was best for Jackson to enforce those ordinances.

66.     An additional member of the City Council suggested the ordinance needed more work to provide clarity.  Howard indicated that he could meet with this member or any of the other members but emphasized that the ordinance as written had been upheld by federal courts and was thoroughly vetted and tested.

67.     A different member of the City Council asked whether any of the calls referenced by the police commander had anything to do with harassment, which can be addressed with existing law.  He also wondered about the ramifications of the ordinance, observing that the proposed ordinance would affect all health care facilities.  These questions were left unanswered.

68.     President Lindsay withdrew the motion, stating that the matter would be taken up a later time and considered for a full vote during regular meeting.

69.     On October 1, 2019, at the next regular City Council meeting, a motion was made to approve the ordinance, which was seconded.  One member of the City Council spoke in favor of ordinance and another member spoke against it.

70.     President Lindsay spoke in favor of the motion, recognizing the business leaders in the Fondren district of Jackson who had spoken in favor of the ordinance, their contributions to the tax base, and how they were seeking help from the City Council.  She commented on how she wanted to see the Fondren district continue to thrive and grow.  In light of activity going on around the JWHO abortion clinic, President Lindsay declared: "What the Council must do at this point in time is consider what the businesses community in Fondren is putting forth as a real need for some better and more peaceful moments in their community, especially during special events and business hours."

71.     President Lindsay also recognized Mayor Lunumba, who wished to be heard.  He denied that the ordinance was of his making, clarifying: "This was responding, or it was placed on there responding to, a request from the business community."

72.     Howard recommended an amendment to the ordinance that would define "shouting".   A motion was made to accept the amendment and was seconded.   Hearing no objection, the amendment to the ordinance passed.

73.     President Lindsay then called for a vote on the ordinance itself.  The motion carried 3 to 1.  The Jackson City Council adopted § 86-401, *et. seq*. Prohibiting Certain Activities Near Health Care Facilities.

74.     This ordinance that passed, § 86-401, *et. seq*., reads as follows:

**SECTION 1**. The Jackson Code of Ordinances is hereby amended to include the following new Article which shall be codified in Chapter 86 as Article XI (Sections 86-401 thru 86-409), and read as follows:

**Sec. 86-401. - Purpos**e.
This article is enacted to protect, preserve and promote the health, safety, and welfare for the citizens of the City of Jackson through the provision of unobstructed access to, and quiet environs within, Health Care Facilities for the purpose of obtaining medical counseling and treatment for residents and visitors to the City. The City Council recognizes that the exercise of a person's right to protest or counsel against certain medical procedures is a First Amendment activity that must be balanced against another person's right to obtain medical counseling and treatment in an unobstructed manner and that is free from increased health risks such as those associated with shouting or other amplified sound. The Jackson Police Department has been consistently called upon to mediate the disputes between medical providers, those seeking medical counseling and treatment, and those who would counsel against their actions so as to (i) avoid violent confrontations which would lead to criminal charges and (ii) enforce existing City ordinances which regulate use of public sidewalks and other conduct; such services require a dedicated and indefinite appropriation of policing services, which is being provided to the neglect of the law enforcement needs of the precinct(s) in which these facilities exist. The City seeks a more efficient and wider deployment of its services which will also help reduce the risk of violence and provide unobstructed access to Health Care Facilities by setting clear guidelines for activity in the immediate vicinity of the entrances to Health Care Facilities. It is the intent of this article to establish guidelines that will ensure that patients have unimpeded access to medical services that may be conducted in a calm environment while ensuring that the First Amendment rights of those

seeking to communicate their message are not impaired. Having found less restrictive alternatives to be ineffective or impractical, the City finds that limited buffer and bubble zones and limitations on amplified sound outside Health Care Facilities established by this article will ensure that patients' rights to safely receive medical services are protected while ensuring that the First Amendment rights of those who seek to communicate their message to their intended audience are not impaired .

### Sec. 86-402. - Definitions.

"Health Care Facility" as used in this article includes but is not limited to hospitals, physicians' offices, walk-in medical centers, medical diagnostic centers, surgical centers, and facilities which are licensed, certified or otherwise authorized to perform medical procedures in this state and to provide health services. It shall not include residential homes, convalescent homes or other facilities that provide long term residency.

"Shouting" as used in this article shall mean any reasonably loud boisterous or raucous shouting in any residential area or within a quiet zone.

### Sec. 86-403. - Eight-Foot Personal Bubble Zone.

No person shall knowingly approach another person within eight (8) feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person in the public way or sidewalk area within a radius of one hundred (100) feet from any entrance to the property of a Health Care Facility.

### 49 Sec. 86-404. - Fifteen-Foot Buffer Zone.

No person or persons shall knowingly congregate, patrol, picket or demonstrate in a zone extending fifteen (15) feet from any entrance to the property of a Health Care Facility.

### Sec. 86-405. - Limitations on Sound.

No person shall shout or, by any means, produce any amplified sound, including but not limited to a loudspeaker, drum, radio, phonograph, stereo set, tape or CD player, television, sound amplifier, or other electronic audio instrument or device that produces or reproduces amplified sound on any public street or sidewalk or from private property within one hundred (100) feet of the property line of a Health Care Facility, provided that the public streets or sidewalks adjacent to such facilities shall be clearly marked by conspicuous signs identifying those areas. Any Health Care Facility that identifies the facility as being located in a quiet zone in accordance with this article shall be subject to the same limitations on amplified sound described herein.

It shall be the duty of said Health Care Facilities or owners of such establishments to erect and maintain signs in some conspicuous place on every street, avenue or alley in the vicinity of every Health Care Facility, public or private, indicating that the same is a "quiet zone." The signs which must meet and conform to the City's sign code shall be placed on such streets, avenues or alleys upon which a Health Care Facility is situated and shall read in a manner similar to, but not restricted to, the following: "Hospital - Quiet Zone" or "Health Care Facility - Quiet Zone."

### Sec. 86-406. - Effective Hours.

14

The provisions of this article shall only take effect during the Health Care Facility's business hours and if the area contained within the zone described is clearly marked and posted.

**Sec. 86-407. - Exemptions.**
This article shall not apply to:
> (1) law enforcement, ambulance, firefighting, construction, utilities, public works, and other municipal agents acting within the scope of their employment, or
> (2) authorized security personnel employees or agents of the Health Care Facility engaged in assisting patients and other persons to enter or exit the premises.

**Sec. 86-408. - Enforcement.**
Nothing in this article shall prevent City of Jackson police officers from obtaining voluntary compliance by way of warning, notice, or education.

**Sec. 86-409. - Penalties.**
Any violation of any of the provisions of this article shall be a misdemeanor and shall be punishable by a fine of not more than $1,000.00 or by imprisonment for not more than 90 days, or both.

**SECTION 2**. That all provisions of the ordinances of the City of Jackson in conflict with the provisions of this ordinance be, and the same are hereby, repealed; and, all other provisions of the ordinances of the City of Jackson not in conflict with the provisions of this ordinance shall remain in full force and effect.

**SECTION 3**. That should any sentence, paragraph, subdivision, clause, phrase or section of this ordinance be adjudged or held to be unconstitutional, illegal or invalid, the same shall not affect the validity of this ordinance as a whole, or any part or provision thereof other than the part so decided to be invalid, illegal or unconstitutional, and shall not affect the validity of the Code of Ordinances as a whole.

**SECTION 4**. This ordinance shall become effective thirty (30) days after passage and publication.

75.      By its express terms, § 86-401, *et seq*., went into effect thirty (30) days after passage

and publication of the ordinance.

**Facial Impact of § 86-401, *et seq*. on Benham's Expression**

76.      As he has done on a regular basis in the past, Benham wants to go back to the public

sidewalks next to the parking lot entrance of JWHO and share his life-affirming message, but §

15

86-401, *et seq*. prevents him from conveying his views to his desired audience in a number of overlapping ways, effectively censoring his pro-life message.

77.     Section 86-404, setting out the fifteen-foot buffer zone, forces Benham to move away from his desired spots on the public sidewalk near the entrance of the JWHO parking lot off Fondren Place.  Benham's desired expressive activity in those spots is regulated under § 86-404 in several different respects.  He "congregate(s)" on the corners since he is usually joined by another person.  He "patrol(s)" in that area because he is constantly looking out for people coming to the clinic.  He also "picket(s)" and "demonstrate(s)" through his signs and expressive clothing in these places.

78.     Benham cannot forego these expressive activities because it would severely limit his message. Consequently, Benham is required to move 15 feet away from all three entrances on the Fondren Place side, including both sides of the driveway to the parking lot off Fondren Place.

79.     This forced repositioning severely limits the effectiveness of his signs, moving his signage beyond the sight line of people driving into the parking lot.  Also, his expressive clothing is only readable from a few feet away and cannot be read outside of the buffer zone.

80.     The buffer zone further prevents Benham from handing out literature to people in cars, or conversing with them, as these individuals enter the parking lot through the driveway.  He cannot conduct this activity because he is required to be more than 15 feet away from the driveway of the parking lot.

81.     The only remaining alternative Benham can use to reach people driving in the parking lot is to orally convey his message with them as they exit their vehicles and walk to the abortion clinic entrance.  To be heard from the public sidewalk, Benham must necessarily elevate

16

his voice or use amplification.  And an even greater volume is needed with the buffer zone putting him 15 feet further away from these individuals.

82.      These communicative methods are stymied as well.  Benham is precluded from either raising his voice or using amplification per § 86-405, the provision that bars shouting and amplified speech within 100 feet of the property line of JWHO abortion clinic.

83.      The quiet zone, employed in conjunction with the buffer zone, eliminates Benham's and others' oral speech, leafletting, and expressive clothing, and severely limits the effectiveness of signs, severely curbing communicative efforts to reach individuals who use the JWHO parking lot to enter the abortion clinic.

84.      The consequence of these two sections leaves only the individuals who park on Fondren Place as possible recipients of Benham's message.  And yet, communication to these individuals is also limited in a severe way, for it is hampered by the bubble zone requirement contained in § 86-403.

85.      Because of this section, Benham cannot approach individuals who park on Fondren Place.  He must stay eight feet outside of an invisible bubble of every such person, unless he can first obtain permission from the person to approach.  In that many people do not wish to be approached by anyone without first knowing the importance of the message, this floating bubble zone effectively forbids leafletting and conversation.

86.      Benham could avoid some of the adverse effects of this section by standing near one of the entrances to the JWHO abortion clinic, where he could hand out literature and prompt conversation to persons as they approach and walk by him.  But because of the 15-foot buffer zone,

Benham is not permitted to stand near the entrances of the JWHO abortion clinic, stripping him of this communicative option as well.

87.     The combined impact of the buffer zone, the quiet zone, and the bubble zone of § 86-401, *et seq*. severely restricts Benham from conveying his desired religious, pro-life message to his desired audience outside of JWHO abortion clinic.

**Irreparable and Lasting Impact of § 86-401, *et. seq*. on Benham's Expression**

88.     Section 86-401 *et seq*. facilitates an overarching restriction on Benham's expression on city-owned public sidewalks and streets.

89.     Benham ardently desires to return to the public sidewalks and streets outside of JWHO abortion clinic, but he is presently chilled and deterred from returning to the area and sharing his views due to the passage of § 86-401, *et. seq*.  If he complies with the ordinance, his speech would be ineffective and fruitless.  But if he does not comply, he would subject himself to criminal sanction and arrest.

90.     This fear of sanction and arrest severely limits Benham's constitutionally-protected expression on public sidewalks and streets near JWHO abortion clinic.

91.     The impact of chilling and deterring Benham from exercising his constitutional rights on public sidewalks and streets constitutes irreparable harm to him.

92.     Benham has no adequate remedy at law for the perpetual denial of his constitutional rights.

## FIRST CAUSE OF ACTION

**Violation of Free Speech Clause**

18

93.     Benham's religious, pro-life expression constitutes protected speech under the First Amendment.

94.     Section 86-401, *et. seq.* on public ways:

    a.      enforces overly broad restrictions on protected speech;

    b.      singles out pro-life views for discriminatory censorship;

    c.      restrains constitutionally-protected speech in advance of its expression, without appropriate guidelines or standards to guide the discretion of officials charged with enforcing the policy;

    d.      chills the free speech and free exercise of religion of Benham and third-party citizens;

    e.      restricts speech on basis of content and viewpoint; and

    f.      lacks narrow tailoring, fails to achieve any legitimate government purpose, and fails to leave open alternative avenues for expression.

95.     Defendants have no compelling or legitimate reason that can justify their censorship of religious and pro-life viewpoints that Benham seeks to communicate on public sidewalks and streets in Jackson.

96.     Defendants have no compelling or legitimate reason that can justify enforcement of § 86-401, *et seq.*, to curb speech in traditional public fora.

97.     Section 86-401, *et seq.* thus violates the Free Speech Clause of the First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment.

98.     WHEREFORE, Benham respectfully prays the Court grant the equitable and legal relief set forth in his prayer for relief.

## SECOND CAUSE OF ACTION

**Violation of Due Process Clause**

99.     Section 86-401, *et. seq.* contains vague verbiage and lacks objective standards needed to curtail the discretion of city officials. This gives Defendants abundant opportunity to enforce the policies in an *ad hoc*, arbitrary, and discriminatory manner.

100.     Defendants have no compelling or legitimate reason that can justify the vague language of the ordinance.

101.     Section 86-401, *et seq.* violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Benham respectfully prays the Court grant the equitable and legal relief set forth hereinafter in his prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Benham respectfully prays for relief in that this Court:

A.     Assume jurisdiction over this action;

B.     Enter a judgment and decree declaring that § 86-401, *et seq.* is unconstitutional on its face and as applied to Benham's desired speech, violating the rights of Benham and third parties not before the Court, as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

C.     Enter a preliminary and permanent injunction enjoining Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any

of them, from applying § 86-401, *et seq.* to Benham's religious and pro-life expression on public

ways outside of JWHO abortion clinic;

      D.     Enter a preliminary and permanent injunction enjoining Defendants, their agents,

officials, servants, employees, and all persons in active concert or participation with them, or any

of them, from enforcing § 86-401, *et seq.* to restrict protected speech in traditional public fora;

      E.     Adjudge, decree, and declare the rights and other legal relations with the subject

matter here in controversy, in order that such declaration shall have the force and effect of final

judgment;

      F.     That this Court award Plaintiff Benham nominal damages arising from the objective

chill of the exercise of his constitutional rights;

      G.     That this Court award Plaintiff Benham his costs and expenses of this action,

including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable

law; and

      H.     Grant such other and further relief as appears to this Court to be equitable and just.


      Respectfully submitted,


s/Nathan W. Kellum_____
NATHAN W. KELLUM
MS BAR # 8813; TN BAR #13482
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN  38117
Telephone: (901) 684-5485
Email: nkellum@crelaw.org
Attorney for Plaintiff Philip Benham

## **VERIFICATION OF COMPLAINT**

I, Philip Benham, a citizen of the United States and a resident of Concord, North Carolina, hereby declare that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged therein are true and correct.



PHILIP BENHAM