## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**PHILIP BENHAM**,

      Plaintiff,

vs.

**CITY OF JACKSON, MISSISSIPPI, and JAMES E. DAVIS, in his official capacity as Chief of Police for Jackson Police Department**

      Defendants.

CIVIL ACTION NO:
3:19-cv-00911-HTW-LRA

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

Plaintiff Philip Benham ("Benham") brings Motion for Preliminary Injunction against named defendants (referred to jointly as "Jackson") seeking relief from Jackson Code of Ordinance § 86-401, *et seq*., an ordinance that censors his religiously-based, pro-life expression on public sidewalks, streets, and ways outside the Jackson Women's Health Organization ("JWHO") abortion clinic in Jackson, Mississippi, criminalizing virtually all of his methods of communication.

## STATEMENT OF FACTS

### *Benham Engages in Religious Pro-Life Expression*

Benham is a travelling Christian missionary who seeks opportunities to share the gospel of Jesus Christ, as well as biblically-based beliefs about abortion and its impact the practice has on unborn human life. (Verified Complaint [VC], ¶¶ 14-16; Affidavit of Philip Benham, ¶¶ 3-7, attached to Motion for Preliminary Injunction [MPI] as Exhibit [Ex.] "A"). He has been involved in pro-life ministry for decades, having served as director for a preborn Christian

organization from 1994 to 2014.  (VC, ¶ 17; Ex. A, ¶ 7).  And he continues with his ministry to this day, regularly traveling across the country to share his beliefs about preborn life with those contemplating or otherwise affected by abortion.  (VC, ¶ 18; Ex. A, ¶¶ 7-8).  Benham especially wants to reach women and others who visit abortion clinics with a message about the love of Jesus and how abortion harms women, hoping he can persuade them to choose life.  (VC, ¶ 19; Ex. A, ¶¶ 9-10).  When given a chance, Benham also offers practical help, supplying information about goods and services that help women keep their babies.  (VC, ¶ 20; Ex. A, ¶ 9, 19).

Benham goes to public sidewalks, streets, and ways bordering abortion clinic property to share his message because he knows these places are the only places where he can reach his intended audience.  (VC, ¶ 21; Ex. A, ¶ 11).  In communicating his pro-life message, Benham likes to display signs bearing concise statements and images about abortion.  (VC, ¶¶ 22-23; Ex. A, ¶ 12).  He also wears clothing with pro-life messaging. (VC, ¶ 25; Ex. A, ¶ 13).   Benham further hands out pamphlets with a gospel message and abortion facts.  (VC, ¶ 24; Ex. A, ¶ 12). If given opportunity, Benham will engage individuals in friendly conversation standing a comfortable few feet away.  (VC, ¶ 26; Ex. A, ¶ 14).   Benham also usually brings an amplification device with him so he can speak with people conversationally at a distance, but if he does not have one, he will raise his voice to be heard, if necessary.  (VC, ¶ 27; Ex. A, ¶¶ 15-16).

When going to speak in public areas outside an abortion clinic, Benham often joins local Christians in this effort.  (VC, ¶ 28; Ex. A, ¶ 17).  He does not condone acts of violence or harm, including against abortion clinics or staff.  (VC, ¶ 29; Ex. A, ¶ 20).  Benham wants to be respectful and winsome with his pro-life speech.  (VC, ¶ 30; Ex. A, ¶ 18).

***Benham Wishes to Speak in Public Areas Outside JWHO Abortion Clinic***

Among other locations in different parts of the country, Benham wants to share his message about abortion on public sidewalks, streets, and ways abounding JWHO abortion clinic in Jackson, Mississippi, a location he has visited many times in the past couple of decades.  (VC, ¶ 31; Ex. A, ¶ 21).  Planning out his itinerary for 2020 travel schedule, Benham intends to visit Jackson and, while there, share his beliefs outside of JWHO. (VC, ¶ 32; Ex. A, ¶ 22).

JWHO is an abortion clinic located on the northwest corner of N. State Street and Fondren Place in the Fondren area of Jackson.  (VC, ¶¶ 33-34; Google Map of overhead satellite shot of Jackson Women's Health Organization and surrounding areas, attached to MPI as Ex. "B"; Overhead map of clinic from Central Mississippi Planning & Development District's Hinds County GIS Map Viewer, attached to MPI as Ex. "C").  The clinic has an entrance to its parking lot just west of the building, off of Fondren Place, and two other entrances to the clinic are on that side as well.  (VC, ¶ 35; Ex. A, ¶ 23; Ex. B; Ex. C).  Individuals going to JWHO primarily enter by driving and the parking in the lot and then walking to the clinic door.  (VC, ¶¶ 36, 43; Ex. A, ¶ 24).  Others park along Fondren Place on both sides of the street and walk to one of the two walking entries to the clinic door.  (VC, ¶¶ 36, 43; Ex. A, ¶ 25).

When Benham shares his message outside of JWHO, he likes to stand on the public sidewalk on either side of the parking lot driveway entrance (usually the west side) and display a sign while watching for individuals driving from N. State Street onto Fondren Place to enter the clinic parking lot.  (VC, ¶ 37; Ex. A, ¶¶ 26-27; *see* Ex. B).  Signage is important to Benham, because he can instantly capture attention and communicate a pro-life message – which is often the only pro-life message a person entering the clinic will receive.  (VC, ¶ 38; Ex. A, ¶ 27).

After grabbing someone's attention with sign and/or expressive clothing, Benham encourages drivers to roll down their window so he can offer them his pamphlets, and possibly have a brief, friendly conversation.  (VC, ¶¶ 39, 41; Ex. A, ¶¶ 27, 29).  These communications are effective in bringing about subsequent, in-depth conversations and sometimes work a change in opinion about abortion.  (VC, ¶ 41; Ex. A, ¶ 29).  In this location, Benham is often joined by a local friend or colleague, allowing him to work in tandem with another in holding signs and handing out pamphlets.  (VC, ¶ 40; Ex. A, ¶ 28).  If a driver proceeds into the parking lot without stopping, Benham will try to share his pro-life message with them orally as they walk from their car to the clinic door, by raising his voice to be heard, or with use of amplification so he can speak conversationally with them.  (VC, ¶ 42; Ex. A, ¶ 30).  When someone parks on Fondren Place and walks toward the clinic, Benham approaches that person to offer literature and tries to engage in conversation with her about abortion.  (VC, ¶ 44; Ex. A, ¶ 31).

### Jackson Enacts Ordinance § 86-401, et. seq. Prohibiting Expression Near Health Facilities

Some members of the Fondren district's business community, including JWHO, asked Jackson City Council to restrict expressive activity near the clinic.  (VC, ¶ 45).  In response, Jackson came up with ordinance § 86-401, *et seq*., prohibiting certain activities near health care facilities, which was first entertained by the City Council on September 17, 2019.  (VC, ¶ 46). At that juncture, City Council President Virgi Lindsay asserted a need for more time to deliberate and hear public comments.  City Attorney Tim Howard also wanted to ensure that necessary information was put in the record due to "constitutional pitfalls" with the ordinance.  (VC, ¶ 47).

Thereafter, on September 26, 2019, Jackson City Council held a special meeting to consider § 86-401, *et seq*., allowing for discussion in support and against its passage. (VC, ¶ 48;

DVD of portion of Jackson City Council special meeting of September 26, 2019 discussing § 86-401, *et. seq*., attached to MPI as Ex. "D"). President Lindsay called on City Attorney Howard to speak on behalf of the ordinance, who, in reiterating his concern about "constitutional pitfalls," opined that though the ordinance restricts speech, it is still constitutional because it does not restrict too much speech. (VC, ¶¶ 49-50; Ex. D). Expounding on the provisions of the ordinance, he explained § 86-403 would prevent people from knowingly approaching another within 8 feet of that person for the purpose of expression, unless the approached person consented, on public ways and sidewalks within a 100-foot radius of a health care facility, asserting that the provision is constitutional due to similar bubble zone upheld in *Hill v. Colorado*, 538 U.S. 703 (2000). (VC, ¶¶ 51-53; Ex. D). He did not indicate whether JWHO or any other health care facility in Jackson encountered similar concerns that supported the provision in *Hill*. (VC, ¶ 53; *see* Ex. D). Howard also described another provision, § 86-404, setting out a 15-foot buffer zone around any entrance to a health care facility in which congregating, patrolling, picketing, and demonstrating are forbidden, relying on *Bruni v. City of Pittsburg*, 283 F.Supp.3d 357 (W.D. Pa. 2017) as support for its constitutionality. (VC, ¶¶ 51-52, 54; Ex. D). He did not indicate whether the history of facilities in Jackson is akin to the history that supported the ordinance in *Bruni*. (VC, ¶ 54; *see* Ex. D). Howard then listed some generalized government interests upheld in those cases. (VC, ¶ 55; Ex. D). He did not comment as to how any of these interests relate to concerns outside the JWHO or other Jackson medical facilities. (VC, ¶¶ 55-56; *see* Ex. D). Howard further discussed provision § 86-405, that bans shouting and any amplified sound within 100 feet of the property line of a health care facility, relying on an ordinance upheld in *Pine v. West Palm Beach*, 762 F.3d 1262 (11th Cir. 2014) in

support, without commenting whether the Jackson ordinance shares a similar history as the West Palm Beach ordinance upheld in *Pine*.  (VC, ¶ 57; Ex. D).

As evidential support for § 86-401, *et seq*., Howard called on Commander Keith Freeman with the Jackson Police Department, who oversees the precinct where JWHO is located, to speak to the City Council about the ordinance.  (VC, ¶ 58; Ex. D).  Commander Freeman informed the Council that the police department has received over 300 calls for service regarding activity outside the JWHO in the past ten years.  (VC, ¶ 59; Ex. D).  He did not describe the nature of the calls or say whether they were merited, and he acknowledged that policing efforts had so far been "very effective."  (VC, ¶¶ 59-60; Ex. D).  However, he bemoaned the time police officers spent responding to complaints from JWHO clinic, as police could be doing other things (VC, ¶ 59; Ex. D).  He hoped the ordinance would resolve this efficiency concern.  (VC, ¶ 60; Ex. D).

Subsequently, President Lindsay called on members of the public to provide any commentary on the ordinance, 5 in opposition to the ordinance and 5 in support of the ordinance, allotting each person 3 minutes each.  (VC, ¶ 61; Ex. D).  Those opposing the ordinance complained of the ways the ordinance impedes speech.  (VC, ¶ 62; Ex. D).  The director of JWHO, three business leaders, and a resident of Fondren district, spoke in favor of the ordinance, all of whom complained about expressive activity outside of JWHO having an adverse impact on local businesses.  (VC, ¶ 63; Ex. D).

In response to questions from council members, Howard explained that though the focus was on JWHO, the city was required under law to treat all health care facilities the same, and that although existing ordinances might apply, he believed it best not to enforce them due to a prior consent decree (though it had purportedly expired).  (VC, ¶¶ 64-65; Ex. D).  Addressing a

request to clarify the ordinance, Howard said he could meet with council members, but emphasized the ordinance as written had been thoroughly vetted and tested by federal courts. (VC, ¶ 66; Ex. D).  Another council member asked if harassment could be addressed with existing law, and about the ramifications of the ordinance given its effect on all health care facilities, but these questions went unanswered.  (VC, ¶ 67; Ex. D).  President Lindsay withdrew the motion and said the matter would be taken up and considered for full vote at a regular meeting.  (VC, ¶ 68; Ex. D).

On October, 1, 2019, the next regular Jackson City Council meeting, the council allowed public comment on any matters, again limited to 3 minutes per person.  (VC, ¶ 69; DVD of portion of Jackson City Council regular meeting of October 1, 2019 containing public comment on §86-401, *et seq*., attached to MPI as Ex. "E").  Several people spoke against the ordinance due to its impact on expressive activities.  (Ex. E).  Four individuals spoke in support of the ordinance, focusing on the general economic effect expressive activities could have on businesses in the area.  (Ex. E).  Among them were two individuals affiliated with the JWHO, who were critical of expressive activity in the area.  (Ex. E).  No specific incidents of problems were mentioned.  (Ex. E).

Following further business at the meeting, a motion was made to approve the ordinance, which motion was seconded.  (VC, ¶ 69; DVD of portion of Jackson City Council regular meeting of October 1, 2019 discussing §86-401, *et. seq*., attached as Ex. "F").  Speaking in favor of the ordinance, one councilman reiterated the business-related concerns, voicing the intention to ensure a "secure economic business community" in the Fondren area.  (Ex. F).  President Lindsay similarly stressed the business interests referenced by business leaders in Fondren who

contributed to the tax base and were seeking help from the council.  (VC, ¶ 70; Ex. F).  Mayor Lunumba added that the ordinance was not of his making but sought by the business community.  (VC, ¶ 71; Ex. F).  Prior to voting on the ordinance, Howard recommended an amendment to it to add a definition for shouting, which proposal was accepted.  (VC, ¶ 72; Ex. F).  Jackson Ordinance § 86-401, *et. seq*., as amended, was then voted on by Jackson City Council and passed.  (VC, ¶ 73; Ex. F).

### Section 86-401, et. seq. Bans Pro-Life Expressive Activities in Pubic Areas Near JWHO

Jackson Ordinance § 86-401, *et. seq.* contains three different provisions curbing speech. Expounding on the purpose of § 86-401, the ordinance sets forth a blanket concern about "provision of unobstructed access to, and quiet environs within, Health Care Facilities," without specifying any particular incidents of this happening in the community.  (Jackson Code of Ordinance § 86-401, *et. seq*., attached as Ex. "G").  The ordinance also identifies a concern over the number of calls fielded by the Jackson Police Department to "mediate the disputes between medical providers, those seeking medical counseling and treatment and those who would counsel against their actions" so as to avoid violent confrontation and enforce existing city ordinances regulating use of public ways.  (Ex. G).  The purpose statement for § 86-401, *et. seq.* also sets out an aspiration to provide "clear guidelines for activity in the immediate vicinity of the entrances to Health Care Facilities."  (Ex. G).

Section 86-403, entitled "Eight-Foot Personal Bubble Zone," mandates that "[n]o person shall knowingly approach another person within eight (8) feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person in the public way or

sidewalk area within a radius of one hundred (100) feet from any entrance to the property of a Health Care Facility." (Ex. G). Section 86-404, the "Fifteen-Foot Buffer Zone," provides "[n]o person or persons shall knowingly congregate, patrol, picket or demonstrate in a zone extending fifteen (15) feet from any entrance to the property of a Health Care Facility." (Ex. G). And, Section 86-404, called "Limitations on Sound" states "[n]o person shall shout or, by any means, produce any amplified sound, including but not limited to a loudspeaker, drum, radio, phonograph, stereo set, tape or CD player, television, sound amplifier, or other electronic audio instrument or device that produces or reproduces amplified sound on any public street or sidewalk or from private property within one hundred (100) feet of the property line of a Health Care Facility" and also establishes the need for signage to alert to the nature of the area as a "quiet zone." (Ex. G).

Section 86-409 declares that a violation of any provision in the ordinance is a misdemeanor, subjecting violators to a fine of up to $1,000, 90 days imprisonment, or both. (Ex. G). Section 86-407 holds certain classes of people are exempt from all of the restrictions of § 86-401, *et. seq.,* namely, municipal agents and "authorized security personnel employees or agents of the Health Care Facility engaged in assisting patients and other persons to enter or exit the premises." (Ex. G). By its terms, the ordinance went into effect thirty (30) days after passage and publication of the ordinance. (VC, ¶ 75; Ex. G).

### Section 86-401, et seq. Curbs Every Aspect of Benham's Expression

On its face, Ordinance § 86-401, *et seq.* criminalizes every conceivable form of Benham's desired expression. Section 86-404, the buffer zone, ousts Benham from any kind of communication in his desired location on the sidewalk adjacent to the JWHO driveway entrance

(and other entrances) because he "congregate(s)" by standing with another person, "patrol(s)" by looking out for people coming to the clinic, and picket(s)" and "demonstrate(s)" through his signs and expressive clothing.  (VC, ¶¶ 77-78; Ex. A, ¶ 33).  This repositioning prevents Benham from offering literature to individuals entering the parking lot or conversing with them.  (VC, ¶ 80; Ex. A, ¶ 34).  It further renders his expressive clothing unreadable and puts his signs beyond sight line.  (VC, ¶ 79; Ex. A, ¶ 34).  This consequence only leaves oral speech for Benham, either raised or with amplification, to reach individuals as they exit their vehicles and walk to the clinic door, but these options are precluded by another provision.  (VC, ¶ 81; Ex. A, ¶ 35).  Section 86-405, the quiet zone, also prohibits Benham from engaging in this activity within 100 feet of the clinic's property line, affording him with no meaning way to convey his message to people entering the JWHO through the driveway.  (VC, ¶¶ 82-83; Ex. A, ¶ 35).  Benham's only remaining option is to reach only those who park on Fondren Place and walk to the clinic.  (VC, ¶ 84; Ex. A, ¶ 36).  But even this limited option is foreclosed to Benham, as § 86-403, the bubble zone, prohibits him from approaching within 8 feet of people to converse or hand out tracts unless he first secures permission in advance, a highly unlikely event, since he is not able to effectively communicate the import of the message prior to approaching.  (VC, ¶¶ 84-85; Ex. A, ¶¶ 36-37).  And, while Benham could mitigate this bubble zone concern, to a certain extent, by standing in one spot next to one of the entrances and wait for people as they approach and pass him, the buffer zone provision prohibits this activity too.  (VC, ¶ 86; Ex. A, ¶ 38).

The combined impact of the buffer zone, quiet zone, and bubble zone effectively eliminates Benham's pro-life message on public sidewalks and ways in the vicinity of the JWHO.  (VC, ¶¶ 76, 87-88; Ex. A, ¶ 39).  Benham strongly desires to share his pro-life message

in these public venues, but he refrains from doing so due to the adverse of impact of § 86-401, *et seq*., facially prohibiting all of his desired expression in public venues under threat of criminal sanction.  (VC, ¶ 89; Ex. A, ¶ 40).  The fear of sanction and resulting chill on Benham's exercise of constitutional rights on public sidewalks, streets, and ways constitutes irreparable harm for which Benham has no adequate remedy at law.  VC, ¶¶ 90-92; Ex. A, ¶ 41).

## ARGUMENT

A preliminary injunction is appropriate when the movant demonstrates "(1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest."  *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 457 (5th Cir. 2017); *accord Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 288 (5th Cir. 2012).  Benham meets these prerequisites.

## I.  BENHAM IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS

Benham "*must* be deemed likely to prevail" unless Jackson can show its speech-restrictive ordinance is a constitutional measure.  *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666 (2004) (emphasis added).  The prospect of Jackson accomplishing this feat is doubtful.  Speech restrictions, like § 86-401, *et seq.,* are judged through the lens of forum analysis, assessing A) whether the expressive activity is constitutionally protected, B) the nature of the forum where the speaker wants to speak, and from which, C)  the suitable level of scrutiny to apply to and judge the restriction.  *Cornelius vs. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1995).  And this analysis reveals that § 86-401, *et seq.* cannot overcome the

requisite scrutiny, in that it suppresses much protected speech on public city sidewalks, streets, and ways.

### A. Benham's Forms of Expression are Protected

Benham wants to convey a religiously-based message about abortion and its ramifications through signs, expressive clothing, literature, conversation, and, on occasion, elevated voice and amplification.

The Free Speech clause of the First Amendment to the U.S. Constitution protects expression coming from a religious perspective. *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995); *see also Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 831 (1995) (religious viewpoints on certain topics). This protection extends to religious beliefs about abortion. *See Whole Woman's Health v. Smith*, 896 F.3d 362, 376 (5th Cir. 2018), *as revised* (July 17, 2018) (Ho, J., concurring) ("The First Amendment expressly guarantees…the right of the Bishops to express their profound objection to the moral tragedy of abortion."). Likewise, the First Amendment covers the various forms by which these views can be uttered, including "leafleting, sign displays, and oral communications," on the topic of abortion. *Hill v. Colorado*, 530 U.S. 703, 715 (2000); *see also Schneider v. New Jersey*, 308 U.S. 147, 160-61 (1939) (literature distribution); *Murdock v. Pennsylvania*, 319 U.S. 105, 110 (1943) (religious literature distribution and conversation); *Boos v. Barry*, 485 U.S. 312, 318 (1988) (signs); *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (expressive apparel). The First Amendment further shields reasonable amplification employed to aid speech. *Reeves v. McConn*, 631 F.2d 377, 382 (5th Cir. 1980) (citing *Saia v. New York*, 334 U.S. 558,

561-62 (1948)).  Thus, Benham's expressive content and all the ways he seeks to communicate it classify as protected speech.

### B. Fondren Place and Bordering Sidewalks and Ways are Traditional Public Fora

Benham wants to carry out his pro-life messaging on Fondren Place, a public city street, and the adjoining sidewalks and ways in front of JWHO.

"Public sidewalks are traditional public fora that time out of mind have facilitated the general demand for public assembly and discourse."  *Frame v. City of Arlington*, 657 F.3d 215, 227-28 (5th Cir. 2011) (citation and quotation marks omitted).  In similar vein, "all public streets are held in the public trust and are properly considered traditional public fora," without the need for any "particularized inquiry" about their purpose.  *Frisby v. Schultz*, 487 U.S. 474, 481 (1988). Due to their pedigree and historical significance, public sidewalks, streets, and ways occupy a "special position" in forum analysis.  *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (citation omitted).  These types of fora are considered "quintessential" venues for speech activity.  *See Houston Chronicle Pub. Co. v. City of League City, Tex.*, 488 F.3d 613, 616, 622 (5th Cir. 2007) (sidewalks and "unpaved shoulders" are quintessential public fora).  Public ways located near abortion clinics are treated no differently.  *See McCullen*, 573 U.S. at 476 ("public way[s]" and "sidewalk[s]" outside abortion clinics are traditional public fora).  The sidewalks, streets, and ways in front of JWHO, just like other sidewalks, streets, and ways, are traditional public fora.

### C. Section 86-401, *et seq*. is an Unconstitutional Restriction on Protected Speech

The classification of these areas as traditional public fora is consequential.  A government entity's capacity to regulate expression in such spaces is "sharply circumscribed," severely limiting its ability to regulate private speech.  *Serv. Emps. Int'l Union, Local 5 v. City of Houston*

[*SEIU*], 595 F.3d 588, 595 (5th Cir. 2010) (citation omitted).  To survive constitutional scrutiny, a speech restriction in a traditional public forum must "be content-neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Jackson's ordinance falls well short of this standard.

Section 86-401, *et seq*., is a compilation of three onerous speech restrictions that Jackson shoehorned into a singular law for the purpose of broadly censoring expressive activity taking place outside an abortion clinic. Jackson cannot justify its massive overreach.  Instead of developing regulations designed to address real issues occurring in the community, Jackson borrowed each restriction from another jurisdiction - without having the context or history needed to back up the legislation.  None of the listed restrictions are substantiated here and no set of circumstances could possibly substantiate the convergence of all three of them. The cumulative impact of these restrictions, working in conjunction with each other, eliminates virtually all forms of protected speech in traditional public fora.

Section 86-401, *et seq*. plainly violates the First Amendment.  It is not narrowly tailored to address any significant interest, it does not advance any significant interest, it fails to leave ample alternatives, and it is impermissibly content-based.

### 1.   Ban on Harmless Forms of Expression is Not a Narrowly Tailored Regulation

Section 86-401, *et seq*. imposes an extensive ban on numerous methods of speech expressed within certain geographic areas in proximity of an abortion clinic (as well as other medical facilities), including public sidewalks, streets, and ways.  Jackson claims the ban on expressive activities is warranted to curb obstruction on sidewalks and ways near health care

facilities, including JWHO, and to preserve quiet environs within, but this overly broad and flat ban on expression is not a narrowly tailored way to address these supposed interests.

Narrow tailoring requires that speech restrictions not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). As the government entity restricting speech, Jackson bears the burden of proving its restrictions satisfy this scrutiny. *J & B Entm't, Inc. v. City of Jackson*, 152 F.3d 362, 370-71 (5th Cir. 1998). And Jackson cannot make the showing. Literature distribution, sign display, oral expression, and amplified speech are all appropriate and innocuous methods of expression. Conducted by individuals and small groups in public spaces, such activities do not implicate obstruction and neither are they inherently noisy. Jackson cannot substantiate the need to suppress all these forms of communication simultaneously.

Section 86-404, the buffer zone, bars Benham's desired expressive activities within 15 feet of any entrance to JWHO, including his desired spot by the parking lot entrance, because he "congregate(s)" on the corners in joining another person, he "patrol(s)" there by watching out for people coming to the clinic, and he "picket(s)" and "demonstrate(s)" through the display of signs and expressive clothing. (Ex. A, ¶ 33; Ex. G). Consequently, the buffer zone provision forces Benham to go beyond arms-reach of people, hindering his ability to pass out literature or converse with them as they drive into the parking lot of JWHO. (Ex. A, ¶ 34). This distance also causes his other forms of expression to be ineffective, making his clothing message unreadable and his sign out of sight line of drivers. (Ex. A, ¶ 34). The only other way Benham can reach people entering the clinic via the driveway is to orally address them with a raised voice or amplification as they exit their vehicles in the parking lot and walk toward the clinic. (Ex. A, ¶

35).  But this kind of speech triggers another provision, § 86-405, the quiet zone, which prohibits shouting and amplified speech within 100 feet of the property line of JWHO.  (Ex. A, ¶ 35; Ex. G).  The combination of these two provisions keeps Benham from sharing his message to individuals going to the clinic through the adjoining parking lot.  (Ex. A, ¶ 36).

Benham cannot even address the people who park along Fondren Place and walk to the clinic from those spots.  (Ex. A, ¶ 36). Yet another provision thwarts any attempt to reach these individuals, that being, § 86-403, the bubble zone provision, which prohibits Benham from approaching anyone within an invisible 8-foot bubble zone to offer literature or engage in conversation without advance permission to do so.  (Ex. A, ¶¶ 36-37; Ex. G).  And, of course, in light of the buffer zone provision, neither can Benham stand close to an entrance and visit with people as they approach and walk by him.  (Ex. A, ¶ 38; Ex. G).

These three interrelating restrictions, working together, eliminate all means of Benham's speech and, in effect, his message.  Such a wide-ranging ban on expression, impacting a wide variety of expression, is not a narrowly tailored means for addressing legitimate obstruction or noise concerns. *See United States v. Grace*, 461 U.S. 171, 176, 181-82 (1983) (ban on literature distribution and sign display on sidewalks bordering Supreme Court not narrowly tailored to address obstruction or tranquility concerns); *Bays v. City of Fairborn*, 668 F. 3d 814, 823, 825 (6th Cir. 2012) (policy banning "solicitation of causes," including sign display, literature distribution, conversation, and "preaching" outside of booths at a public festival in a park held not narrowly to address concerns about pedestrian traffic flow, public safety, congestion and overcrowding).

In *Brown v. City of Pittsburg*, the Third Circuit Court of Appeals specifically invalidated a similar ordinance to Jackson's - that combined an 8-foot bubble zone with a 15-foot buffer zone near abortion clinic entrances - as not narrowly tailored.  586 F.3d 263, 279-80 (3d Cir. 2009).   Reaching this conclusion, the court described the layering of these two separate restrictions as "unprecedented" in preventing a speaker from either approaching a passerby or standing stationary near their pathway and handing literature to them, thereby "severely curtail[ing]," if not "effectively foreclos[ing] leafletting entirely."  *Id.* at 279, 281.  The Third Circuit found no case law supporting the mishmash of both zones as a narrowly tailored method for achieving legitimate government interests. *Id.* at 279.

Jackson's ordinance is even more burdensome than the one struck down in *Brown*, for it not only combines a bubble zone with a buffer zone but adds a quiet zone on top of them.  (Ex. G).  Hence, aside from precluding literature distribution and conversation, and eviscerating the effectiveness of signs and expressive clothing, Jackson's ordinance appends public speech to the list of expressive casualties.  *See Halfpap v. City of W. Palm Beach*, No. 05-80900-CIV-MIDDLEB, 2006 WL 5700261, at *23-*25 (invalidating 20-foot buffer zone ordinance in part because of its impact on speech in conjunction with sound ordinance).[1]

Jackson's grouping of speech restrictions is not advanced by any of the cases it relied on in drafting and passing the ordinance, because none of these cases contemplated this extraordinary convergence.  Indeed, each case reasoned that the individual restrictions at hand

---

[1] Section 86-401 *et. seq.* further expands the restrictions to cover all medical facilities. The Supreme Court has noted that where a problem has arisen "in one city at one clinic, creating [] buffer zones at every clinic across the Commonwealth is hardly a narrowly tailored solution." *McCullen*, 573 U.S. at 493.  By the same token, Jackson's enactment of the ordinance at issue, applying to all health care facilities in the city, when its purported interests only pertain to JWHO, is not sufficiently tailored to address the purported concerns.

were narrowly tailored precisely because they did not affect other forms of speech.  In *Hill v. Colorado*, the Supreme Court held an 8-foot bubble zone was narrowly tailored because it did not prevent the speaker from standing in a location where their desired audience would pass by close enough to receive literature or engage in conversation, did not prevent signs from being seen, and did not restrict the raising of one's voice or using amplification to be heard.  530 U.S. at 726-28.  Similarly, in *Pine v. City of W. Palm Beach*, the Eleventh Circuit upheld as narrowly tailored an ordinance that restricted only amplification, leaving individuals "free to talk, sing, hold up signs, [] distribute literature to patients within the quiet zone," and engage in other forms of speech.  762 F.3d 1262, 1274-75 (11th Cir. 2014).[2]  And, in *Bruni v. City of Pittsburgh*, the district court held a 15-foot buffer zone around entrances to an abortion clinic as narrowly tailored since it still allowed speakers to engage in any form of desired expression outside the buffer zone, including raising their voices and walking through the buffer zone toward someone to converse or distribute literature.  283 F.Supp.3d 357, 370 (W.D. Pa. 2017).  *See Bruni*, 941 F.3d 73, 90 (3rd Cir. 2019) (affirming buffer zone did not prevent any expressive activity outside of the zone).[3]

---

[2]  Moreover, the contextual language of the ordinance in *Pine* indicated that it banned only "loud and raucous" amplification, *id*. at 1271-73, not all amplification as the Jackson ordinance does. Section 86-405 is not susceptible to the same construction because the noise provision in *Pine* was part of a comprehensive noise ordinance, whose stated purpose, definitions, and prohibitions were saturated with repeated references to prohibiting "loud and raucous," "excessive," and "boisterous" noise, justifying the construction going beyond the literal verbiage. *Id.*

[3] The Third Circuit was also able to construe the buffer zone restriction to allow for one-on-one communications including normal conversations and leafletting within the zone. *Id.*  With the existence of a bubble zone in § 86-401, *et. seq*., precluding this very activity, no such construction is available here.

Barring virtually all forms of expression concurrently, § 86-401, *et seq*. goes far greater than any of the restrictions supported by case law.  It is not narrowly tailored to meet a significant government interest.

### 2.  Section 86-401, *et seq.* Restrictions Do Not Advance Significant Government Interests

For that matter, § 86-401, *et seq*. restrictions do not further any significant government interests.  A government entity must do more than "'assert[] interests [that] are important in the abstract.'"  *Saieg v. City of Dearborn*, 641 F.3d 727, 736 (6th Cir. 2011) (quoting *Turner Broad. Sys., Inc. v. F.C.C*., 512 U.S. 622, 664 (1994).  It must show the asserted interests are real and not conjectural.  *Saieg*, 641 F.3d at 736.

Jackson does not have a legitimate (much less a significant) interest in § 86-401, *et. seq*. It resolved to enact a law that would quash pro-life expression outside of JWHO after certain members of the Fondren business community, including JWHO, complained about the prospect of this activity interfering with their economic interests.  Jackson also observed that its police force was spending time responding to calls about activity around the clinic.  As way to address these concerns, Jackson crafted the subject ordinance designed to target and eliminate pro-life expression occurring within 100 feet of the abortion clinic.  And, in doing so, it did not tie the restrictions to any of the motivations behind the law.  Rather, Jackson took note of an 8-foot bubble zone deemed constitutional in *Hill*, a 15-foot buffer zone surviving scrutiny in *Bruni*, and a quiet zone upheld as valid in *Pine*, and in thinking three restrictions must be better than one, lumped them altogether in one comprehensive ordinance without having a basis for any of the individual restrictions.

Far different from the history leading up to § 86-401, *et seq.*, the laws referenced in the cases that Jackson relied on in creating the ordinance were supported by proof of real problems implicating significant government interests and justifying the restrictions.  In *Hill*, the State of Colorado passed its 8-foot bubble zone upon hearing substantial testimony from eyewitnesses "that revealed widespread, violent confrontations" at clinics, and that abortion opponents were frequently engaged in "physically blocking entrances, intimidation, and harassment of individuals seeking services," as well as yelling, screaming, and thrusting signs in people's faces. *Hill v. Thomas*, 973 P.2d 1246, 1249-51 (Colo. 1999); *see Hill*, 530 U.S. at 709-10 & n. 7. Similarly, the 15-foot buffer zone upheld in *Bruni* was premised on testimony of no less than "13 cases of aggressive pushing, shoving and hitting," and that people's access to the clinic was frequently obstructed before they reached the entrance, necessitating the more drastic restriction. 283 F.Supp.3d at 361-62, 372.  And, the quiet zone that passed muster in *Pine* was supported by much testimony "that people outside the clinic yelled and screamed and used megaphones to shout things that were audible from inside the clinic."  *Pine*, 762 F.3d at 1265; *see Halfpap*, 2006 WL 5700261, at *4-*5 (S.D. Fla. Apr. 12, 2006) (noting that on several occasions, the city council met and "received substantial public comment" regarding the sound ordinance legislation, including several witnesses with personal knowledge testifying about specific incidents involving "protesters' use of megaphones to yell amplified threatening and intimidating comments at patients").

There is no like factual background undergirding Jackson's ordinance.  In drafting, deliberating, and passing § 86-401, *et. seq.*, Jackson did not receive or seek out any accounts of obstruction or loud noise at JWHO.  The only evidential support for the ordinance, coming on

September 26, 2019, amounted to one police officer complaining to the City Council about the burden police encountered in having to respond to calls of purported disturbances outside of JWHO, without addressing whether any of these calls verified the existence of or concerned obstruction or excessive noise.  (VC, ¶ 59; Ex. D).  The testimony centered on police efficiency, suggesting the police could have been doing something more worthwhile if not for the calls.  (VC, ¶ 60; Ex. D).[4]  But, even as it concerns this isolated gripe, the officer elaborated that police communication was "very effective" in resolving the conflicts at the clinic.  (VC, ¶ 60; Ex. D).

Also, on this day, as well as on October 1, 2019, Jackson entertained comments from the public, including nine citizens speaking in support of the ordinance generally.  (VC, ¶¶ 61, 63; Ex. D; Ex. E).  And the predominant concern expressed by these individuals concerned the general effect expressive activity outside the clinic could have on the economy of businesses.  (VC, ¶ 63; Ex. D; Ex. E).  A few spoke more directly about the ordinance's restrictions, but their remarks were vague and general in nature, omitting specific examples of any incidents.  (Ex. D; Ex. E).  Subsequently, in passing the ordinance, City Council members and the Mayor echoed the business-related concerns they were receiving, voicing their intention to ensure a "secure economic business community" in the Fondren area and give requested aid to businesses who contribute to the tax base there.  (VC, ¶¶ 70-71; Ex. F).

The scant information about any true issues with obstruction or excessive noise demonstrate that any concerns about these matters are conjecture at best and do not delineate any real, habitual problems forming a significant interest for the passage of § 86-401, *et. seq*.  *See, e.g., Halfpap*, 2006 WL 5700261, at *22-*24 (invalidating 20-foot buffer zone around clinic

---

[4] Any interest in police efficiency is not a significant one in this context.  *See McCullen*, 573 U.S. at 495 (rejecting assertion that police efficiency justified a buffer zone around abortion clinic entrances).

entrances in part due to a dearth of evidence of actual problems related to the restriction). Lacking a significant interest in support, the ordinance is unconstitutional.

### 3. A Flat Ban on Virtually All Forms of Expression Does Not Leave Open Ample Alternatives for Communicating Pro-Life Message

Separate and apart from the requirement that speech restrictions be narrowly tailored to a significant interest, they must also leave open ample alternative channels of communication to survive under the First Amendment. *Perry*, 460 U.S. at 45. An alternative is deemed ample if it gives the speaker opportunity to reach his intended audience with his intended message. *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 866 (9th Cir. 2001). It is not suitable to ban speech in "appropriate places [] on the plea that it may be exercised in some other place." *Schneider*, 308 U.S. at 163. For "it cannot rightly be said that all [] forums are equal." *Mahoney v. Babbitt*, 105 F.3d 1452, 1459 (D.C. Cir. 1997).

The extraordinarily broad ban set out in § 86-401, *et seq.* fails to leave ample alternatives for Benham's expression. On its face, the ordinance imposes three separate kinds of speech restrictions that conjunctively serve to wipe out all practical methods of expression that Benham or others could utilize on public ways outside the clinic, forcing pro-life speakers to steer far away from their prospective audience without the benefit of speaking in a louder tone. Depriving Benham of any meaningful opportunity to share his desired message to his desired audience, Jackson's ordinance does not leave any ample alternatives for him. *See Weinberg v. City of Chicago,* 310 F.3d 1029, 1041 (7th Cir. 2002) (alternative locations for speech are not ample "if the intended message is rendered useless or is seriously burdened."); *Halfpap*, 2006 WL 5700261, at *25 (conjunctive effect of buffer zone and sound restriction do not leave ample alternatives).

### 4.  Ban on Pro-Life Expression is Content-Based

Section 86-401, *et seq.* is also content-based.  In assessing whether speech restrictions are facially content-neutral, it is not enough to gage whether they directly target content.  As held in *Reed v. Town of Gilbert*, distinctions based on speech's function or purpose or speakers are content-based restrictions as well. 135 S.Ct. 2218, 2227, 2231 (2015).

 In *Reed*, the Supreme Court held a law making a distinction between signs "designed to influence the outcome of an election" and signs "communicating a message or ideas for noncommercial purposes" is "obvious[ly]" content-based and impermissible. *Id.* (quotation marks omitted).  The Court reasoned that a law delving into the purpose of signage – whether to inform of an event, persuade someone to vote a certain way, or convince someone to adopt an ideological viewpoint – was a necessarily a content-based regulation because content ultimately determined whether the speech was restricted.  *Id.* at 2227.

In the same way, § 86-401, *et. seq.* implicates content, setting out a distinction between perspectives of speech expressed outside the clinic.   On its face, the ordinance exempts clinic employees and agents from the ordinance's restrictions whole cloth when they are "engaged in assisting patients and other persons to enter or exit the premises."  (Ex. G).  JWHO employees or agents are thus free to engage in any manner of expressive activity to usher patients and others into the clinic, including using amplification to play music or speak through, approaching within 8 feet of individuals without consent to speak, distributing literature, holding signs, and wearing expressive clothing.   All the while, Benham and others who share his message are flatly prohibited from engaging in any of these forms of expression in these same spaces for the purpose of persuading people to not enter the clinic.  Assigning this blanket exemption to JWHO employees and agents, § 86-401, *et seq.* manifests a preference for a certain kind of speech –

23

specifically, that facilitating patronage at the JWHO – based on its content. *See Thomas v. Bright*, 937 F.3d 721, 731 (6th Cir. 2019) (speaker-based restrictions that "reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)" are content-based) (citation and quotation marks omitted). The ordinance's exemption renders § 86-401, *et seq.* a content-based ordinance on its face, and thus, unconstitutional. *See Bruni*, 941 F.3d at 94-95 (Hardiman, J., concurring) (noting *Reed* ensures laws regulating speech near abortion clinics do not "allow[] [clinic] employees to engage in speech that others could not," or classify speech based on the speech's purpose without being deemed content-based).

## II.   BENHAM IS SUFFERING IRREPARABLE HARM

Section 86-401, *et seq.* presently prohibits Benham from exercising his right to free speech on public sidewalks, streets and ways near JWHO. Benham strongly desires to visit these public fora to share his message in the near future, at some point in 2020, but Jackson's extreme, overlapping restrictions and threat of criminal sanction in it deter him from doing so. (VC, ¶¶ 89-92; Ex. A, ¶¶ 40-41). Benham's "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Opulent Life Church*, 697 F.3d at 295 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

## III.   BALANCE OF HARMS FAVORS GRANTING PRELIMINARY INJUNCTION

The preliminary injunction that Benham seeks would help him and others from suffering irreparable harm in losing the exercise of constitutional rights. On the other hand, Jackson would encounter no harm should the injunction issue, for the city has no legitimate interest in enforcing its patently overbroad ordinance barring harmless expressive activity on public sidewalks, streets, and ways near JWHO.

## IV.    PRELIMINARY INJUNCTION SERVES BEST INTEREST OF THE PUBLIC

"[I]njunctions protecting First Amendment freedoms are always in the public interest."

*Opulent Life Church*, 697 F.3d at 298 (citations omitted).  And Benham's requested injunction

against Jackson's facially unconstitutional § 86-401 *et. seq.* eliminating numerous types of

protected expression in public fora would serve this public interest.

## CONCLUSION

For the reasons set forth herein, Benham respectfully requests that this Court grant his

Motion for Preliminary Injunction.

Respectfully submitted this 11th day of December 2019.

s/Nathan W. Kellum
NATHAN W. KELLUM
MS BAR # 8813
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN  38117
(901) 684-5485 – Telephone
(901) 684-5499 – Fax

Attorney for Plaintiff Philip Benham

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2019, the foregoing was filed electronically with

the Clerk of the Court by using the CM/ECF system, and that a copy of the foregoing has

been/will be delivered to a process server for service on defendants.

/s/Nathan W. Kellum
Attorney for Plaintiff Philip Benham

25